Mr. Jacobson. Good morning, Your Honors. I'm here on a motion, an appeal, for my motion to dismiss as granted. To plead our case on behalf of the taxi drivers, we had to show five elements under Missouri law. Those were that the taxi drivers had a business expectation, that Uber had knowledge of it, that there was an intentional interference that disrupted the expectation, an absence of justification, and damages. The district court dismissed the case on the grounds that there was no valid business expectation on the part of taxi drivers. It erred in doing so. The Missouri Supreme Court tells us that for purposes of interference with, tortuous interference with business expectations, expectation is just that, hope. And if the hope is reasonable, then the plaintiff has a valid expectation. And so it's a reasonable hope, right? And objectively reasonable hope, right? Say some of the cases. Correct. Okay, proceed. That's exactly right, Your Honor. And so what we have here is, it's just as you would in any case involving a history of profits and sales, any type of damage to a business. You look, is there a history of it? Is there a history of revenues, a history of profits? Are they consistent over time? If you have a consistent past, we assume that it's reasonable to assume that that past will project into the future. Here the pleadings allege that the taxi drivers have a long history of profits operating to taxi businesses, that they plan based on their past performances. They know when the market is good, when the market is bad, and the shifts in the market for taxi services were slow and anticipatable. So there is expectation. Where the district court went wrong here was it looked at this case as though it was a case claiming interference with a specific transaction, a specific contract. But it's not a case involving a specific contract. It's not the case that, oh, we had Mrs. Jones, we took her to the hospital for dialysis every Tuesday and now she's riding Uber. That's not the case. This is a case and there's not a huge amount of Missouri case law in this area, but what there is, is in our favor. But there are also parallel cases we discussed at length in our brief for other states that follow the same rule, where this is a business that's offered to the public in general. You have to be able to define the group, and the group that we define here is that part of the public that's looking for a ride for hire, a taxi ride, in St. Louis. And that's a defined group. You don't have to be able to identify Mr. Jones, Mr. Smith, and so on as being people who want taxi rides. You have to say, yes, there's a population. They ride to taxis regularly. They have for years, for decades. And you don't know who you're going to get any particular ride, but you know you're going to be getting a fare. And taxi drivers have been doing this for years and years. So there is a valid expectation. In this regulated industry, why isn't this up to this Metropolitan Taxi Commission to enforce and not a private lawsuit? Two separate answers to that, Your Honor. First, I think the record reflects it. I know the court record reflects it elsewhere. The MTC did, in fact, bring actions to enforce its regulations. But we're not here enforcing regulations. We're here saying, our business, our personal well-being has been interfered with by your actions. Uber had two choices in entering the taxi market in St. Louis. They could say, we will follow the law. There's a state law here. The state law says there's this commission that regulates. The commission has these rules. And the commission has told us, yes, you can operate. We're going to waive some of our regulations. But you have to use drivers who are chauffeurs, have a chauffeur license. You have to use drivers who go through a criminal background check. We're waiving the other things, but requiring you to do that. The day that the MTC made that ruling, Uber started its business. It turned on its clock and let people start driving. People with no chauffeur license and people with no known criminal background history. So they could have followed the rules and competed. And if they did, we would have no complaint. We wouldn't be filing a suit. But they chose to ignore the law, which I think it's well known that that's their general business model is wherever they go, they break the law and they like to see how pieces come together. Well, some places these laws give you a private cause of action. This law does not give you a private cause of action, right? Doesn't that hurt you a lot? There's no provision under taxi law that says that a disgruntled passenger or disgruntled driver can sue for it. But Missouri law doesn't require that for a tortious interference claim. Our statute doesn't require that the wrongful act be itself independently actionable. And in several of the cases, the few cases that they cite involving tortious interference cases in other states, I believe it was a Texas case and maybe... Well, what about the Carter case and the sales resource case? Are they both Missouri Merchandising Practices Act? And the Missouri Merchandising Practices Act does have a private cause of action. Well, the Carter case is not a Merchandising Practices Act case. That is a case... What's it about? Tell me. That is a case involving a medical doctor, I believe a pathologist, who had a practice in a town, would regularly get referrals of different patients from different doctors, never knew who was going to refer him to, had no relationships with the patients, but it had a history of this kind of business going on. The hospital changed its rules, making it more difficult for the doctors to refer to him, and also failed to comply with the patient's rights to transmit their medical records to the doctor of their choice. This rule requiring the hospital to transmit medical records did not provide for a cause of action for the patients. It was not intended to benefit the doctor. It's a right for the patient. But that wrongful act, the refusing to forward the patient's medical records, was an act that they did not have a right to do because it was against the statute. I thought there was a private cause of action by statute or something in the Carter case. Am I wrong? I do not recall there being a private cause of action in that case, Your Honor. But in the sales resource case, the MMP... Okay. Go ahead. I would say if there was one on behalf of the patient, I don't recall for sure one or the other, but it definitely was not one on behalf of the doctor who was the person suing for the tortious interference. So take the sales revenue case, the Missouri Merchandising Practices case. As you know, it has a private cause of action. You well know. Yes. So why is that distinguishable? Well, in that particular case, that statute is only for the benefit of family, personal, and household actions, consumer-type actions. In that particular case, the plaintiff was a business. That business had no right to bring an action under the Merchandising Practices Act. They were outside the scope of his protection. Still, the violation of the act was a wrongful act because you don't have a right to violate a statute even if the person you're harming is not the person who's particularly being defended by that statute. So that was sufficient. So yes, there's a private right of cause of action under the Merchandising Practices Act. It was not a cause of action that this plaintiff had. And so, in a sense, for the purpose of this patient, for the purpose of that plaintiff, there was no private right of action because they weren't eligible to exercise it. So the district court dismissed it on the basis that there was no reasonable expectation of business. I think that the case law is pretty strong that the notion that you have to be able to appoint to a particular customer, a particular transaction, doesn't apply in cases where what you're offering is a service to the public at all. As the, I think it was North Dakota case, South Dakota case involving the Deadwood-led patient said, if you have to show the particular customer you needed to serve in these types of cases, the cause of action would disappear entirely and become a nullity. And it's not a reasonable interpretation of the act. So the second basis that was moved into motion, it was not a basis of decision below, but I feel important to address, is whether or not Uber had a right to do what it did. It's our obligation as a plaintiff in the Missouri law to prove the absence of justification. It's not a defense, it's an element of the cause of action. Counsel, before you go there, I'd like to back up just a moment. Would you agree with me that if this was a free market situation, that a generalized expectation of future business from the public is not a valid business expectancy? Your Honor, I would not, because a number of the cases in which there are tortious interferences, it is a free market thing. The question is whether you have a particular expectation of this business and whether the person's actions are justified. So where I'm going with this is we're not in a free market. This is a highly regulated industry. And so to me, a key question here is whether or not a reasonable expectation of business advantage can be based on a regulatory scheme enacted by the government. Well, I think that just like fish swim in water, businesses swim in regulations, and they are part of the entire environment around you. And so if there are a series of laws out there that regulate, drivers are regulated not just as to training hours and so on, that color of the shirt and whether it's buttoned down or not, the age of their cars, it's highly regulated. But the regulations that are of the most importance to the public and ones that the MTC said will apply here are that the drivers have the proper licensure, that there's chauffeured licenses showing they have a higher level of ability than just any driver on the street, and that they have a clean criminal record. And so to say that we have to go as drivers, we have to comply with all these rules, follow the laws, and someone else can come in and simply thumb their nose at the laws that are there and compete with us in a way that they have no justification to do it because you're not justified to break the law to engage in business. And that's where Uber keeps making its slide in this market to say, you're upset that we're competing with you. This is just a business thing. And sure, would we like to not compete with Uber? Of course. But we have no rights. It's not like we have a monopoly on the taxicab business. But we have a right to expect that if there's safety laws out there that apply to our industry, that everyone gets to do it. It's like, if I'm a coal mine and I'm subject to all these regulations to have Joe's Coal Mine open down the street that simply doesn't let the inspectors come in and just dig some coal willy-nilly, I think that I have a right to expect that the government is going to apply the rules against them as well. So here the question is, does Uber have a right to compete with us in this way? And they don't. They had a right to go and follow the rules. They had a right to go and lobby the state to change the rules, which is what they did. So we have a slightly less than two-year time period because they got a new law in that exempted them from the regulations. Now, they had a right to do that. We can't complain about that. We don't. We say, you're entitled under new rules. Our class period ends the day before. But during the time that they're acting in violation of the law, they are acting without justification. And the method they use is also not justified because they're doing, the method itself is violating the law. Now, they like to pooh-pooh and say, well, it's just regulatory issues. We have regulatory issues. It's not regulatory issues. There's a specific Missouri statute that says you will do this, you will follow this taxi code. And the taxi code is very explicit at what is and is not permitted. So it's not minor issues. It's the entire fundamental structure of how their business was operating for that slightly less than two-year period was against Missouri law. I see I'm almost at the end of my time. Now, I'd like to preserve some time for rebuttal if there's any questions. Go ahead. All right. Thank you. It's reserved. Mr. Clark? May it please the Court? My name is Eric Clark on behalf of Uber Technologies Incorporated. Your Honors, this is a case of tortious interference, which is a claim that simply does not fit the alleged facts in the complaint here. In this lawsuit, appellants did not represent a single company alleging that Uber interfered with its business. Instead, appellants are from... You're representing the drivers, right? They are individual drivers from separate companies representing a putative class of all taxi drivers. And they can only come close to asserting a valid business expectancy by essentially using the class action mechanism backwards and saying, as a whole, we can establish a valid business expectancy because before Uber entered the market, all of the business came to, well, which one of us? We're not sure, but one of us. And you say none of these cab drivers own their cab or a franchise or a lessee or something or something? What's alleged? I don't know the facts of the case. I don't remember if it's alleged that they own... I think it might be alleged they own their cab. I think it's alleged that some of them identify as drivers, as independent contractors for specific cab companies. Surely that's enough to get past this point, isn't it, at this stage of the game? If you're making an argument, I don't know whether you're making an argument on this point. Go ahead. I don't think so, Your Honor. The point is, even if it's a single cab driver, that makes it harder in a sense, right? Because now, as Your Honor recited, there's an objective reasonable expectation that he or she is going to be the one out of 1,000 alleged taxi cab drivers in St. Louis who gets the next fare. The only way they can come close to doing that is saying, well, if you combine all of us, all 1,000 of us, we know one of the 1,000 would have gotten that fare. And that doesn't work for valid business expectancy. Okay. And what Missouri law do you have? We would cite Rhodes and Sloan. Those two cases, Your Honor, are the closest fact patterns. In the Sloan case, an insurance salesperson used to be able to use a list of turning 65 potential targets for sales. And then the insurance company changed the policy so now he could only use like 10 a month. And he said, well, I had a business expectancy and everybody on that list, and even then, that's at least a list. It's not the public in general. And the Missouri court said, no, you don't. Those names of potential future customers are, quote, legally up for grabs. And therefore, no valid business expectancy. The other side will cite to Carter. What about Carter? Where the doctor didn't know what patients were going to be referred to him. All he knew is that because of what the hospital did, he was going to get fewer referrals. Two important facts that distinguish Carter, Your Honor. First, the primary allegation relevant to tortious interference itself was that there were specific identified doctors who provided these referrals. And so in essence, rather than name all of the potential referrals, there was a named doctors who were providing these potential referrals. So the primary allegation in Carter was at least more narrow. And the second important point, which makes the tortious interference claim, I forget if it was on motion to dismiss or summary judgment in that case, go forward, was a separate basis for their tortious interference claim was that these doctors identified two specific plaintiffs who left those doctors because the hospital wouldn't give their records to their doctor. And that, I mean, so that's just a clear case of having identified either specific doctors with referrals or actual patients that they lost. If we move, part of the issue here, again, it's a lack of a fit on literally every element of tortious interference in Missouri. And, you know, going back to the... Except damages. Go ahead. That's fair. Okay, go ahead. Proceed. Damages. Yeah, because we're at that stage of the game. Go ahead. But if you want to start with damages, what they haven't alleged and what many of the other, you know, district court... Go to a stronger point for you. Go ahead. Sure. Well, one of those points is that the damages that are alleged were caused by the alleged wrongdoing. And there's distinction. And again, some of the district courts that have dismissed on 12B6 Bounds taxicab claims against, tortious interference claims against Uber around the country that we cite in our brief, they specifically point to this point. The competition itself, as my colleague admitted, is not wrongful. It's okay. So therefore, the question has to become whether the alleged wrongful conduct here, not having a valid chauffeur's license, and here not going through a particular background process. I mentioned, although it's not necessary for a motion to dismiss, Uber, there is a criminal background check for drivers who use Uber, but... That's an irrelevant argument. Say something relevant. Fair enough. It's not... Right. And of course, now the state of Missouri recognizes that's perfectly fine. Right. Correct. Just change the law. Right. Go ahead. So, but in any event, the... So those two things, not having a Class E license, have to have caused the damages, not just Uber in the market. But if you look at the actual allegations in the complaint, paragraphs... Let's see if I can find it. I mean, the argument is if you set up regulatory and safety requirements for barbers or lawyers or doctors or whatever, and somebody comes in and says, I can cut hair without having gone to barber school, and I can do it for $2 a person cheaper, they're going to take some business away. And so that's a tortious interference because you didn't get a barber's So what's your answer to that? To two points. Number one, the allegations in this particular complaint don't involve that causal link. Instead, they allege Uber is fully capable of complying with the taxi code in its operations. And they further allege that they will continue to suffer not so long as Uber continues its operations, regardless of whether there's an alleged... I would presume they continue to suffer now, even though it's unarguably... But aren't we only talking about the period of time that's relevant for the complaint? Right. But even during that period of time, Your Honor, they do not allege that the actual regulatory violations are what caused their harm, as opposed to Uber's just mere presence in the market. But the second point on that, Your Honor, is in those situations where a competitor who is allegedly not living up to regulations, a lawyer, as these courts in Missouri, as well as the courts that have dismissed these kinds of cases in other district courts, make clear, there's no private right of action for that. We don't want every plumber who wants to try to get some business back from a competitor to run to state or federal court and say, well, this regulatory issue is now my issue, now this court's issue, as opposed to relegate it to the regulator that a state general assembly has made clear is the body that's supposed to be enforcing these laws. I think, at least in my view, that may be one of your stronger arguments. But what's your best authority for that? That under Missouri law, a person who is in a regulated industry and has competitors who do not follow the rules can't bring a cause of action? Your Honor, we would cite to, in Missouri specifically, we've got two cases that I can't remember in the brief that are just for the basic point that Missouri recognizes that when a regulation doesn't provide a cause of action, private cause of action, a private So to the point of whether a private party can call it tortious interference and say, well, the wrongful means is this particular regulation, we would cite to the Nosby-Abrams case. Now, granted, that was a fraudulent concealment, not tortuous interference, tort, but the same argument was made. There was a regulation that was being violated, and they tried to use that as an essential element of a fraudulent concealment claim, and the Why? Because we have to defer to the General Assembly's wishes when it comes to which branch of government, executive or, I should say, whether the executive branch of government or any private party can enforce those regulations. And when the General Assembly says nothing about a private cause of action in a regulation, that General Assembly is saying only the And that's the answer as well, Your Honor, with regard to the Carter case that Judge Benton was discussing. In the Carter case, the General Assembly provided a private cause of action for a plaintiff to go ahead and get his or her records. That crosses that important line, right? Now the General Assembly says some private party can go ahead and bring a cause of action under this. But what about the argument that your opponent made that that may be true, but the person who actually brought the lawsuit is not the party who is the protected party under the statute, nor is that a party for whom the private cause of action was provided for? Yes, Your Honor. I need the doctor. Courts dealing with this specifically explain that's the value for tortious interference purposes, because indeed, that plaintiff could just sue under that cause of action, right? But if that cause of action, which already can be brought by a private party, has caused tortious interference between that party that could sue and someone else, then we've satisfied the concern in the NOS case that this particular regulation isn't the sole jurisdiction of the agency. Some private party can, so now for tortious interference purposes, another private party can. Well, let's assume during this two-year period of time where Uber was operating in violation of Missouri statute, somebody's involved in an automobile accident or somebody sexually assaulted, and they said, well, if you had done a criminal background check, you would know you're hiring criminals. And would that person have a private cause of action under this statute? Under the MTC statute, Your Honor? Yes. No. There is no private cause of action under the MTC regulations or the statute, the enabling statute. There may be other causes of action in that situation. And again, we would fight those facts about a lack of background checking pretty vigorously. But for purposes of the question, there may be other causes of action, but they could not bring it under the MTC regulations. Indeed, if this case were to go forward, it would be the first ever private cause of action under these MTC regulations. It's never happened before, and there's a reason. And that is one of the reasons why many of the district courts around the country have entertained these unfair competition or tortious interference causes of action by taxi companies against Uber and dismissed them at the 12B6 stage. And I think we covered the main points. I mean, the rest are in the brief. I don't know if I need to highlight any more. I mean, there are additional elements that cause problems. One is knowledge of the valid business expectancy. So again, it's derivative of the point that there's no valid business expectancy. But some of these that the taxi industry or taxi drivers cannot simply allege, as exactly as the plaintiffs alleged here, that Uber knew exactly what was going on in the industry. And Uber knew exactly that there were taxi cabs around who were making their business this way. And that's good enough for knowledge of a valid business expectancy. Well, Uber surely knew that, right? It's alleged that they did. I don't think we would dispute it. But the point is, that's not enough for a knowledge of a valid business expectancy because you actually have to interfere with it. And courts have dismissed these claims on that ground, too. Again, derivative of the idea that there's no valid business expectancy in the first place because you cannot simply come together as an entire competing group of people and say, among us, one of us probably, or I guess definitely one of us, one of the thousand that we represent, would have gotten this fare. You need to allege that you knew this fare was coming to you. If they were organized as a cooperative instead of this way that they're organized, would they have a cause against you? You know what a true cooperative is? They have them in rural America. I'm sorry. I just didn't hear that. A true cooperative. You know what a true cooperative is? A true cooperative is where the owners are the owners and they split everything in percentages and all this. A true cooperative would have a case against you. I still don't think so, Your Honor, because I mean, I think that would be... On what we're talking about now. Right. I think that would be the Sloan case. Sloan essentially tried to say that I personally alone, nobody else, could have a valid business expectancy in the entire list of people who I'm going to sell insurance to, and the court said no. And here I think it's just a step removed because they can't even make that allegation that Sloan made. Instead they say someone among us probably would have gotten this fare. That's not enough for a valid business expectancy. I thought Sloan, though, went off more on the legitimacy of the reason. That they didn't want, the insurance company didn't want every one of their agents getting the same list and having 10, I can't remember what insurance company, it was a Banker's Life, I think it was. They didn't want 12 Banker's Life agents calling these people at 8 o'clock at night. And that was, I mean, to me that's, I don't know that Sloan really says a lot for your case. I see my time has expired. May I answer that question? Yes, you certainly may. Very briefly, yes, that was another problem, a justification problem, but Sloan specifically also mentions the fact that the names on those lists were, quote, legally up for grabs for the purpose of the valid business expectancy element, Your Honor. Thank you for your argument. Mr. Jacobson. Thank you, much to cover. On Sloan we discuss it at length in our and I think it's very clear it doesn't have anything to do with this case. Missouri does not require you to show a specific business transaction that a particular transaction interfered with. We recognize as Carter and as Bell, which was the May department store where he may apply for credit in the future. Who with? We don't know, he just may. That was sufficient. He says that we say we have no problem with Uber being in the market. That's not quite right. We say Uber would not have been in the market, but for violating the rules. They could have followed the rules, in which case we'd have no complaint, but their actual presence was entirely the fruit of their poisonous tree of violating the law. They say that we are all competing with each other, so none of us can claim that we lost the fair. The fact that you are in competition with other people who are competing legitimately does not give a halo to the person who is tortuously interfering. Yes, we're all competing, and all of us, from far as we know, had an immediate 30-40% hit on our revenues when Uber came in in violation of state law and began competing. So can we say we would have gotten Mr. Jones' trip from the airport? No, none of us can say that, but we can say based on past history that all of us would have had the additional 30-40% of business we had prior to that, and each of us did it individually. This is not a case, which he suggests, in which the class instrument is being used to create a cause of action. Yes, the class instrument will ensure that everyone gets defended, everyone gets their rights, and it makes the damage calculation probably a little easier in a lot of ways, but we each individually have a claim, and I think we made that clear in our brief. Rhodes is an interesting case. It has very little to do with this case. There's two contracts. One was a real contract, one was an invalid contract. No claim that the valid contract was interfered with. Invalid contract, the court said you can't notoriously interfere with an invalid contract, and then examines, even though the contract's invalid, do you still have a reasonable expectation of business under that invalid contract? And the court said, no, in this case, because your valid contract said you might not get the other contract, and all you might get is the money in the first contract. So almost every one of their cases involves a contractual situation in which a party is enforcing its contract. The complaining party or plaintiff says, hey, we had this contract. You could do A, but I'd make more money if you did not A, and so you've interfered with me. And the defendant says, hey, you agree we do A. We're doing A. And the court says, yes, you can do that. That's all their cases. Their out-of-state cases are almost all Lanham Act cases. There's almost none of them are tortious interference cases. The two that were tortious interference cases were under statutes with different laws, states with different laws, which required that the actual act be wrong, itself independently actionable. In regard with the Noss case they cited, it wasn't discussed in their brief at any length. We didn't discuss it in our brief. I recall reading at some point it has, as far as I can recall. It's cited in their brief. Yes, it's cited in one of their string cites. Right, it is. Go ahead. If it had any bearing, anything, I would have discussed it only in my reply brief. I didn't, so I know it has no bearing. Therefore, because I discussed their cases at length. Therefore, I ask that you reverse the dismissal and allow us to move forward and get to the fact stage of the case. Thank you very much. Thank you both for the argument. Case number 17-2724 is submitted for decision.